UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GHR HEALTHCARE, LLC,

Plaintiff,

v. Case No: 8:26-cv-02176-JLB-SPF

LAURA NORRIE *and* ALINTA STAFFING LLC,

Defendants.
_______________________________/

**ORDER**

This matter is before the Court on Plaintiff GHR Healthcare, LLC's ("Plaintiff" or "GHR") Emergency Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 6), wherein GHR seeks to: (1) enjoin Ms. Laura Norrie and Alinta Staffing LLC (together, the "Defendants") from any further use or disclosure of GHR's confidential information and trade secrets; (2) enforce Ms. Norrie's restrictive covenants; (3) require preservation, return, accounting, and disgorgement of GHR's information and property; and (4) permit expedited discovery and targeted forensic inspection. (Doc. 6).

On July 28, 2026, GHR filed this lawsuit against Defendants. Against Ms. Norrie alone, GHR alleges breach of a non-competition and non-solicitation agreement (Count I); breach of confidentiality agreement (Count II); and breach of fiduciary duty and the duty of loyalty (Count III). And against both Ms. Norrie and Alinta, GHR alleges misappropriation of trade secrets under the Florida Uniform Trade Secrets Act (the "FUTSA") (Count IV) and under the Defend Trade Secrets

Act (the "DTSA") (Count V). (Doc. 1 at 15–26). Plaintiff now seeks a temporary restraining order and preliminary injunction, as well as expedited discovery, arguing that Plaintiff has a substantial likelihood of success on its DTSA, FUTSA, breach of contract, and breach of fiduciary duty claims. (Doc. 6).

For the reasons explained below, the Court concludes that Plaintiff has demonstrated, at this preliminary stage, a substantial likelihood of success on the merits of its DTSA claim, a likelihood of irreparable injury in the absence of a temporary restraining order issued before Defendants can be heard in opposition, that the equities weigh in Plaintiff's favor, and that public interest favors injunctive relief. Accordingly, Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 6), and Plaintiff's Time-Sensitive Motion for Expedited Discovery (Doc. 7) are due to be **GRANTED in part** to the extent that a temporary restraining order shall be issued as set forth below. The Court will set a status hearing and/or hearing on Plaintiff's motion for a preliminary injunction by separate order.

## JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The Court has diversity jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332(a)(1). Based on the allegations in the Verified Complaint, the Court concludes that it can properly exercise personal jurisdiction over Defendants and that venue properly lies in the Middle District of Florida. *See* 28 U.S.C. § 1391.

## FACTS[1]

GHR is a healthcare and information technology staffing company that recruits and places candidates with customers nationwide. (Doc. 1 at ¶ 10). GHR's RevCycle Workforce division focuses on revenue-cycle staffing for the healthcare industry. (*Id.*). The division recruits and places professionals in revenue cycle, medical coding, Health Information Management (HIM), Clinical Documentation Integrity (CDI), and related healthcare staffing roles. (*Id.*).

On November 20, 2024, GHR hired Ms. Norrie as a Recruiter in its RevCycle division, working out of GHR's Tampa, Florida office. (*Id.* at ¶ 11). In this role, Ms. Norrie recruited and placed healthcare professionals for customers nationwide. (*Id.* at ¶ 12). Her duties included identifying and cultivating candidate relationships, sourcing and screening potential candidates, maintaining candidate information within GHR's recruiting systems, and working with GHR personnel to satisfy customer staffing needs. (*Id.*). Through those duties, Ms. Norrie obtained access to GHR's candidate database and other confidential business information, including

[1] The Supreme Court has stated that "all of the well-pleaded allegations of [a] complaint and uncontroverted affidavits filed in support of [a] motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976). Some courts in this circuit have applied that rule to review of requests for temporary restraining orders as well. *See Am. Builders and Contractors Supply Co. Inc. v. McPherson*, No. 3:23-cv-24132, 2023 WL 11760715, at *1 n.2 (N.D. Fla. Sept. 12, 2023) (citations omitted) (Plaintiff's human resources manager "verified the complaint and authenticated the documents attached to the TRO motion. The Court accepts the well-pled allegations of the Verified Complaint and the supporting affidavit as true for purposes of this Order."); *Welsh v. Martinez*, No. 2:22-cv-216, 2022 WL 2356971, at *1 n.1 (M.D. Fla. June 30, 2022) (citing *Eldrod*, 427 U.S. at 350 n.1) (in the context of resolving a motion for a temporary restraining order, "[g]iven the case's procedural posture, the facts will be presented in a light most favorable to [Plaintiff]").

candidate contact information, resumes, work histories, credentials, recruiter notes, candidate submissions, placement activity, active-headcount information, pipeline information, customer information, information concerning candidates being considered for placement, and other confidential business information maintained within GHR's recruiting systems. (*Id.* at ¶ 13).

GHR expended substantial time, effort, and resources developing and maintaining its candidate database, candidate contacts, recruiting pipeline, active headcount information, and placement opportunities. (*Id.* at ¶ 14). That information is not publicly available and provides GHR with a competitive advantage in recruiting and placing healthcare professionals in the market. (*Id.*). GHR's candidate database, candidate contacts, active-headcount information, pipeline information, and placement opportunities had substantial value to its business. (*Id.* at ¶ 15).

At the time of Ms. Norrie's departure, GHR maintained multiple candidates within her active pipeline who appeared close to placement. (*Id.*). Those opportunities were developed and maintained through GHR's recruiting systems, personnel, and resources. (*Id.*).

As a condition of her employment, Ms. Norrie executed a Confidentiality, Non-Competition, and Non-Solicitation Agreement with GHR, dated November 20, 2024 (the "Agreement"). (*Id.* at ¶ 16). In the Agreement, Ms. Norrie acknowledged that GHR's trade secrets, confidential information, and business records were proprietary to GHR and agreed that she would not use or disclose such information

except as necessary to perform her job duties. (*Id.* at ¶ 17). Ms. Norrie further agreed that upon the termination of her employment, she would return and would not retain, copy, download, email, transfer, or otherwise preserve GHR's confidential information, customer information, records, data, or other company property. (*Id.*).

Furthermore, she agreed that, for one year following the termination of her employment, she would not, directly or indirectly, engage in, assist, or work for a competing business engaged in the recruitment and placement of healthcare or information technology staffing services within the United States. (*Id.* at ¶ 18). She also agreed that, during her employment and for one year thereafter, she would not directly or indirectly: (a) solicit, service, or accept business from GHR customers or prospective customers for competing services; (b) interfere with GHR's relationships with its customers, prospective customers, or vendors; (c) solicit or accept business of the type she solicited or accepted while employed by GHR; (d) solicit, hire, recruit, or contract with GHR personnel; or (e) induce any GHR employee, consultant, sales representative, or other agent to terminate or diminish his or her relationship with GHR. (*Id.* at ¶ 19).

The Agreement further provides that, upon any breach of Sections 1 through 6, GHR "can pursue and will have available . . . the right to obtain an injunctive or other equitable relief from a court of competent jurisdiction restraining such breach or threatened breach," and that Ms. Norrie "consents to the issuance of such injunction" without any bond or other surety, and that "the prevailing party will be

entitled . . . to recover from the non-prevailing party all costs of such judicial action, including . . . reasonable attorneys' fees and costs." (*Id.* at ¶ 21). The Agreement is governed by Florida law. (*Id.* at ¶ 22).

On June 25, 2026, Ms. Norrie submitted her resignation by email to Barry Matthews, GHR's Senior Vice President of RevCycle. (*Id.* at ¶ 24). Before she resigned, however, Ms. Norrie had already taken steps to establish a competing business. (*Id.* at ¶ 26). According to records maintained by the Florida Department of State, Division of Corporations, Ms. Norrie filed Articles of Organization for Alinta Staffing LLC on June 12, 2026 — thirteen days before her resignation from GHR became effective, and while she remained a GHR employee. (*Id.*). The Articles specify an effective date of June 29, 2026, four days after her resignation. (*Id.*). Publicly available records identify Ms. Norrie as Alinta's sole authorized member and registered agent. (*Id.* at ¶ 27). Those records list no other member, manager, or authorized person associated with Alinta. (*Id.*).

On July 1, 2026, only two days after Alinta's effective formation date and less than one week after Ms. Norrie's resignation from GHR, she registered the domain name alintastaffing.com for Alinta's website. (*Id.* at ¶ 28). On or about July 27, 2026, Alinta's website became publicly accessible at alintastaffing.com. (*Id.* at ¶ 29). The website presents Alinta as a specialized healthcare staffing company that connects healthcare organizations, staffing partners, and vendors with experienced professionals in medical coding, CDI, HIM, auditing, Oncology Data Specialist work, trauma registry, and revenue cycle services nationwide. (*Id.* at ¶ 30).

Upon learning that Ms. Norrie had formed Alinta, GHR attempted to address the matter without litigation. (*Id.* at ¶ 34). On July 8, 2026, GHR's counsel sent Ms. Norrie a letter reminding her of her continuing obligations under the Agreement, noting the timing of Alinta's formation, and requesting that she confirm her understanding of those obligations. (*Id.*). On July 9, 2026, counsel for Ms. Norrie responded, representing that Ms. Norrie "did not copy, download, email, export, transfer, retain, use, or disclose any GHR confidential information, customer lists, candidate information, lead lists, pricing information, CRM/database information, contracts, reports, notes, or other company materials," and confirming that Ms. Norrie would preserve potentially relevant documents. (*Id.* at ¶ 35). The response left unanswered the central question prompting GHR's inquiry: what role Ms. Norrie and Alinta intended to play in the healthcare staffing industry following her resignation. (*Id.* at ¶ 36). The response likewise did not alleviate GHR's concerns regarding the protection and disposition of its confidential information. (*Id.*).

While GHR was attempting to fully determine the nature and scope of Ms. Norrie's post-resignation activities and the disposition of the Company's confidential information, GHR recruiters began encountering problems with candidate records she had been responsible for maintaining. (*Id.* at ¶ 37). One GHR recruiter attempted to contact candidates with whom Ms. Norrie had previously worked and discovered missing and inaccurate contact information.

(*Id.*). As GHR investigated further, additional affected candidate records that had previously been maintained by Ms. Norrie were identified. (*Id.*).

In some candidate profiles, telephone numbers had been removed entirely. (*Id.* at ¶ 38). In others, telephone numbers, email addresses, or other identifying information had been modified through subtle changes, rendering the affected records unreliable and impairing GHR's ability to identify and communicate with candidates. (*Id.*). In many instances, the changes involved altering a single digit in a telephone number or a single character in an email address, making the record appear accurate at first glance while preventing GHR personnel from successfully contacting the candidate. (*Id.*).

As GHR expanded its review, audit log information revealed that Ms. Norrie's unique user account had made approximately 500 alterations to candidate records in GHR's database during at least the final 60 days of her employment, affecting more than 150 of GHR's proprietary candidate profiles. (*Id.* at ¶ 39). GHR's review also uncovered additional irregularities attributable to Ms. Norrie. (*Id.* at ¶ 40). In one instance, GHR identified a candidate record in which the candidate's first name appeared as "Aara" rather than "Sara," making the candidate more difficult to locate through LinkedIn and similar searches. (*Id.*). In another, GHR's records showed that Ms. Norrie's user account deleted information associated with a candidate with whom she had previously worked shortly before her departure and that a resume previously provided by the candidate had not been uploaded to the candidate's profile. (*Id.*). Separately, as GHR's investigation into

Ms. Norrie's conduct was underway, a GHR employee reported that, during the final period of Ms. Norrie's employment, Ms. Norrie photographed information displayed on her computer screen using her personal cellphone. (*Id.*).

GHR then uncovered additional information that heightened its concerns regarding the potential misuse of its confidential information. (*Id.* at ¶ 43). Specifically, GHR identified evidence that a USB device had been attached to Ms. Norrie's computer in the days leading up to her departure. (*Id.*). GHR's review also identified that Ms. Norrie sent approximately 30 LinkedIn InMail messages between April and June 2026, using a LinkedIn account connected to her GHR email address. (*Id.* at ¶ 44). GHR also learned that her husband, Mr. Andrew Norrie, had contacted a competing staffing agency, on or about June 25 or June 26, 2026, to inquire whether it would engage Ms. Norrie as a 1099 recruiter. (*Id.* at ¶ 45).

**DISCUSSION**

Federal Rule of Civil Procedure 65 provides that the Court may issue a temporary restraining order without written or oral notice to the adverse party only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).

The Court may grant a temporary restraining order if Plaintiff demonstrates: (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the restraining order; (3) that the threatened injury to it outweighs the harm the restraining order would cause other litigants; and (4) that the restraining order would not be adverse to the public interest. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001). "The purpose of a temporary restraining order, like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005). A temporary restraining order is an "extraordinary remedy" to which the Court should "pay particular regard for the public consequences" of granting. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).

## I. Substantial likelihood of success on the merits

Plaintiff asserts a claim against Defendants for violation of DTSA and FUTSA. (Doc. 1 at 21–26). "Both the federal [DTSA] and [FUTSA] authorize a court to grant an injunction to prevent 'actual' or 'threatened' misappropriation of a 'trade secret.'" *Primo Broodstock, Inc. v. Am. Mariculture, Inc.*, No. 2:17-cv-9-FtM-29CM, 2017 WL 1502714, at *10 (M.D. Fla. Apr. 27, 2017) (citing 18 U.S.C. § 1836(b)(3)(A)(i); Fla. Stat. § 688.003(1)).

Under the DTSA, the term "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information" if

"the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Thus, Plaintiff must establish that Defendants: "(i) possessed 'information' of 'independent economic value' that (a) was lawfully owned by [Plaintiff] and (b) for which [Plaintiff] took reasonable measures to keep secret, and (ii) 'used' and/or 'disclosed' that 'information,' despite (iii) a duty to maintain its secrecy." *Primo Broodstock, Inc.*, 2017 WL 1502714, at *10 (citing *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)). "In a trade secret action, the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy." *Am. Red Cross*, 143 F.3d at 1410 (citation omitted).

Plaintiff claims that Defendants misappropriated Plaintiff's confidential candidate database and related candidate information, such as candidate names, direct contact information, resumes, work histories, credentials, recruiter notes, submission history, active headcount, pipeline status, placement outcomes, candidate availability, candidate relationships, recruiting history, and placement opportunities to start a competing business, Alinta Staffing LLC. (Doc. 1 at ¶¶ 30, 46, 70, 72–73, 78, 81–82).

Norrie filed Articles of Organization for Alinta Staffing LLC on June 12, 2026, 13 days before her resignation from GHR became effective. (*Id.* at ¶ 26). The Articles specify an effective date of June 29, 2026, four days after her resignation. (*Id.*). Publicly available records identify Ms. Norrie as Alinta's sole authorized member and registered agent. (*Id.* at ¶ 27). Those records list no other member, manager, or authorized person associated with Alinta. (*Id.*).

On July 1, 2026, only two days after Alinta's effective formation date and less than one week after Ms. Norrie's resignation from GHR, she registered the domain name alintastaffing.com for Alinta's website. (*Id.* at ¶ 28). On or about July 27, 2026, Alinta's website became publicly accessible at alintastaffing.com. (*Id.* at ¶ 29). The website holds Alinta out as a specialized healthcare staffing company that connects healthcare organizations, staffing partners, and vendors with experienced professionals in medical coding, CDI, HIM, auditing, Oncology Data Specialist work, trauma registry, and revenue-cycle services nationwide. (*Id.* at ¶ 30).

While GHR was attempting to fully determine the nature and scope of Ms. Norrie's post-resignation activities and the disposition of the Company's confidential information, GHR recruiters began encountering problems with candidate records she had been responsible for maintaining. (*Id.* at ¶ 37). One GHR recruiter attempted to contact candidates with whom Ms. Norrie had previously worked and discovered missing and inaccurate contact information. (*Id.*). As GHR investigated further, additional affected candidate records that had previously been maintained by Ms. Norrie were identified. (*Id.*).

In some candidate profiles, telephone numbers had been removed entirely. (*Id.* at ¶ 38). In others, telephone numbers, email addresses, or other identifying information had been modified through subtle changes, rendering the affected records unreliable and impairing GHR's ability to identify and communicate with candidates. (*Id.*). In many instances, the changes involved altering a single digit in a telephone number or a single character in an email address, making the record appear accurate at first glance while preventing GHR personnel from successfully contacting the candidate. (*Id.*).

As GHR expanded its review, audit log information revealed that Ms. Norrie's unique user account had made approximately 500 alterations to candidate records in GHR's database during at least the final 60 days of her employment, affecting more than 150 of GHR's proprietary candidate profiles. (*Id.* at ¶ 39). GHR's review also uncovered additional irregularities attributable to Ms. Norrie. (*Id.* at ¶ 40). In one instance, GHR identified a candidate record in which the candidate's first name appeared as "Aara" rather than "Sara," making the candidate more difficult to locate through LinkedIn and similar searches. (*Id.*). In another, GHR's records showed that Ms. Norrie's user account deleted information associated with a candidate with whom she had previously worked shortly before her departure and that a resume previously provided by the candidate had not been uploaded to the candidate's profile. (*Id.*). Separately, as GHR's investigation into Ms. Norrie's conduct was underway, a GHR employee reported observing her

photograph information displayed on her computer screen using her personal cellphone during the final period of her employment. (*Id.*).

Furthermore, GHR identified evidence that a USB device had been attached to Ms. Norrie's computer in the days leading up to her departure. (*Id.* at ¶ 43). GHR's review also identified that Ms. Norrie sent approximately thirty LinkedIn InMail messages between April and June 2026, using a LinkedIn account connected to her GHR email address. (*Id.* at ¶ 44). And GHR also learned that Ms. Norrie's husband, Mr. Andrew Norrie, had contacted a competing staffing agency, on or about June 25 or June 26, 2026, to inquire whether it would engage Ms. Norrie as a 1099 recruiter. (*Id.* at ¶ 45).

Taking these factual allegations as true, namely, Alinta's formation, Ms. Norrie's registration of the alintastaffing.com domain, Alinta's public launch as a specialized healthcare staffing business operating nationwide in medical coding, CDI, HIM, trauma registry, oncology data, billing, and revenue-cycle staffing, the alteration of GHR's candidate records, the reported photographing of information displayed on Ms. Norrie's computer screen, the USB-device activity identified during GHR's review, Ms. Norrie's substantial LinkedIn outreach activity during the same period, and the inquiry by Mr. Norrie regarding recruiting work through another staffing agency, the Court finds that Plaintiff has demonstrated a substantial likelihood of success on the merits of its misappropriation of trade secrets claims under the DTSA.

Because Plaintiff established a likelihood of success on the merits as to the DTSA claim, the Court declines at this juncture to address the remaining claims. *See Sapphire Consulting Servs. LLC v. Anderson*, No. 6:20-cv-1724, 2021 WL 1053276, at *3 (M.D. Fla. Feb. 12, 2021) (citation omitted) ("When a plaintiff asserts multiple claims as a basis for a preliminary injunction, the plaintiff 'need only establish a substantial likelihood of success on one claim.'").

## II. Irreparable injury

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. V. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Plaintiff argues that it faces a likelihood of irreparable injury absent a temporary restraining order because Plaintiff's harm due to Defendants' conduct is "concrete and ongoing." (Doc. 6 at 21). "The potential damages from disclosure or misuse of GHR's confidential candidate information cannot be readily estimated." (*Id.* at 22). "Once candidate information, relationship intelligence, and placement opportunities are disclosed or used by a competitor, no later damages award can make the information secret again, restore GHR's competitive position, or repair the loss of candidate relationships, goodwill, and active placement opportunities." (*Id.*).

The Eleventh Circuit has ruled that "the loss of customers and goodwill is an irreparable injury." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (internal quotation marks omitted). Moreover, although the Eleventh Circuit has not explicitly found as much, some courts within this circuit have found

that "[i]rreparable harm is presumed when use of customer lists and solicitation of customers occurs." *See Convergent Nonprofit Solutions, LLC v. Wick*, No. 6:19-cv-1157-Orl-40DCI, 2019 WL 7423549, at *7 (M.D. Fla. Sept. 5, 2019) (quoting *Lynch v. Silcox*, No. 01-8800-CIV, 2001 WL 1200656, at *5 (S.D. Fla. Oct. 4, 2001)).

Here, Plaintiff alleges in its Verified Complaint that Ms. Norrie altered Plaintiff's candidate database, affecting more than 150 proprietary candidate profiles. (Doc. 1 at ¶ 39). Those records include removed or corrupted contact information, deleted candidate information, and a missing resume. (*Id.* at ¶¶ 38, 40). Ms. Norrie photographed information from her GHR computer screen, attached a USB device to her computer in the days before she left, and sent approximately thirty LinkedIn InMail messages whose content and recipients GHR cannot see. (*Id.* at ¶¶ 41, 43–44). In addition, her husband contacted a competing staffing agency about engaging her as an independent recruiter. (*Id.* at ¶ 45). Now, Alinta is publicly accessible online and invites employers to submit staffing requests and candidates to submit resumes for healthcare staffing opportunities in medical coding, CDI, HIM, trauma registry, oncology data, and revenue cycle. (*Id.* at ¶¶ 30–32). Plaintiff alleges that "Alinta is being held out as an active healthcare staffing business operating nationwide in the same specialized revenue-cycle, medical-coding, CDI, HIM, and related healthcare staffing markets in which Norrie worked for GHR." (*Id.* at ¶ 33).

Plaintiff has provided sufficient evidence for this Court to find that the harm to it is ongoing and immediate, that it cannot be undone through monetary

remedies alone, and that if Defendants are not immediately enjoined from using the confidential information obtained from GHR, GHR stands to lose more of its clients.

Accordingly, Plaintiff has provided sufficient evidence that it will likely be irreparably injured absent a restraining order. *See Convergent*, 2019 WL 7423549, at *7 (in the context of a preliminary injunction, "[t]he evidence support[ed] a finding that the Defendants misappropriated Convergent's trade secrets over several months to position Defendant Wick's consulting firm to solicit Convergent's customers. Accordingly, Convergent ha[d] suffered and [would] continue to suffer irreparable harm in the absence of an injunction").

Moreover, in compliance with Federal Rule of Civil Procedure 65(b)(1)(B), Plaintiff's counsel indicated that she has served Ms. Norrie and her counsel via e-mail with the "Verified Complaint, Summons, Preliminary Injunction pleadings, Motion for Expedited Discovery, and related proposed orders." (Doc. 6-1). Plaintiff states that "notice should not be required . . . because there is a real danger that, if given advance notice, Defendants will continue to misuse, disclose, transmit, delete, conceal, alter, or otherwise compromise GHR's confidential, proprietary, and trade secret information before the Court can act." (*Id.*). Plaintiff's counsel also filed certificates of service indicating that she sent Defendants' counsel a copy of the complaint (Doc. 1 at 32), all exhibits attached thereto, including summons (*id.*), and the motion for a temporary restraining order and preliminary injunction together with the proposed order. (Doc. 6 at 27). The Court is satisfied with Plaintiff's counsel's efforts to give notice to the Defendants in accordance with Rule

65(b)(1)(B). Additionally, as explained above, the Court finds that there is sufficient evidence that irreparable injury is ongoing and will result to Plaintiff before Defendants can be heard in opposition. *See* Fed. R. Civ. P. 65(b)(1)(A).

### III. Balance of harms

The balance of harms weighs in favor of granting a temporary restraining order. If a restraining order is not granted, Defendants can continue to use GHR's confidential information and proprietary information to poach GHR's candidates and employers, and benefit from information that GHR developed for its business. Additionally, taking the allegations in the Verified Complaint as true, Plaintiff owns the confidential and proprietary information at stake. *See Truepenny People LLC v. Cota*, No. 3:16-cv-424, 2016 WL 9308534, at *2 (N.D. Fla. Oct. 18, 2016) ("[B]ecause Plaintiff owns the trade secrets and confidential and proprietary information is at stake, the harm to Plaintiff outweighs any threat of potential harm to the Defendant from the injunction.").

### IV. Public interest

Lastly, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations omitted). The Court agrees with other courts that have found that "the public interest is served by protecting trade secrets . . . ." *Freedom Medical, Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1279 (M.D. Fla. 2020) (citation omitted); *see also All Leisure Holidays Ltd. v. Novello*, No. 12-62328-CIV, 2012 WL 5932364, at *6 (S.D. Fla. Nov. 27, 2012) ("The

Court concludes that entry of a TRO to protect trade secrets serves the public interest.").

## V. Bond requirement

Federal Rule of Civil Procedure 65(c) specifies that the Court "may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[T]he amount of security required . . . is a matter within the discretion of the trial court. . . ." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (citation omitted).

Plaintiff has requested that no security or, alternatively, $5,000, should be required under Rule 65(c). (Doc. 6 at 25). The Court finds that a security bond of $5,000 is sufficient to protect Defendants against any loss associated with an erroneous injunction. Accordingly, the Court requires Plaintiff to post a bond of $5,000 that shall be submitted to the Clerk of Court within 4 calendar days from the date of this Order.

## VI. Scope of temporary restraining order

Plaintiff has demonstrated entitlement to a temporary restraining order. However, the Court declines to issue a restraining order of the breadth requested by Plaintiff. At this early stage and before Defendants have had an opportunity to respond, the Court finds that the scope of the temporary restraining order set below is most appropriate. The Court reserves ruling on Plaintiff's motion for expedited

discovery. (Doc. 7). The Court may revise the scope of this temporary restraining order as this matter progresses.

## CONCLUSION

Because Plaintiff has shown, at least at this stage, a substantial likelihood of success on its DTSA claim, a likelihood of irreparable injury in the absence of a restraining order issued before Defendants can be heard in opposition, that the equities weigh in Plaintiff's favor, and that public interest favors injunctive relief, that Plaintiff has met its burden of establishing entitlement to a temporary restraining order.

Accordingly, it is **ORDERED**:

(1) Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 6) is **GRANTED in part** as set forth herein.

(2) Defendants shall **PRESERVE** all documents and information in whatever form they exist relevant to the claims in the Verified Complaint, including, without limitation, all property, data, software, files, and confidential information taken from or created for or by Plaintiff, including its agents, representatives and employees, as well as all communications, documents, and/or data.

(3) Defendants are **ENJOINED** from using or accessing any trade secrets, proprietary information, or confidential information belonging to Plaintiff in any capacity except as it relates to the defense of this instant action.

(4) Defendants are **ENJOINED** from soliciting, doing business with, or servicing any current or prospective client, customer or account that has been solicited or serviced by GHR Healthcare, LLC or any affiliate of GHR Healthcare, LLC until further Order of this Court.

(5) This Temporary Restraining Order shall remain in effect for fourteen (14) days unless any party seeks relief otherwise. The Court will set a hearing on Plaintiff's motion for preliminary injunction and/or a status conference by separate order.

(6) No later than four (4) calendar days from the date of this Order, Plaintiff shall serve Defendants with process, including a copy of all pleadings in this case and this Order, and file proof of same.

(7) Plaintiff is **REQUIRED** to post a $5,000 bond with the Clerk of Court before 5:00 p.m. on August 3, 2026.

(8) The Court strongly recommends that the parties immediately engage in good-faith settlement negotiations, as the litigation in these matters tends to be protracted.

**ORDERED** in Tampa, Florida, on July 30, 2026, at 7:00 pm.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE